1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   SUSAN M. HUFF,                          No. CIV S-07-1635-CMK

12               Plaintiff,

13         vs.                               MEMORANDUM OPINION AND ORDER

14   COMMISSIONER OF SOCIAL
     SECURITY,
15
                 Defendant.
16
     _____/
17

18             Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19   review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20   Pursuant to the consent of the parties, this case is before the undersigned for final decision on

21   plaintiff's motion for summary judgment (Doc. 19) and defendant's cross-motion for summary

22   judgment (Doc. 28).

23   / / /

24   / / /

25   / / /

26   / / /

                                              1

# I. PROCEDURAL HISTORY

Plaintiff applied for social security benefits on September 13, 2004.  In the application, plaintiff claims that disability began on July 3, 2002.  In a disability report submitted with her application, plaintiff claims that disability is caused by a combination of migraine headaches, ovarian cyst, fibroid tumor, asthma, chronic obstructive pulmonary disease ("COPD"), and degenerative disc disease.[1]  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on Mach 14, 2006, before Administrative Law Judge ("ALJ") Robert C. Tronvig, Jr.   In a January 23, 2007, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1. The claimant has not engaged in substantial gainful activity since July 3, 2002, the alleged onset date;

2. The claimant has the following severe combination of impairments: migraine headaches, asthma, hypertension, osteoarthritis, history of fibroid tumors in the uterus, and depression;

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and needs to avoid climbing ladders, ropes, and scaffolds but can occasionally climb ramps and stairs, stoop, kneel, crouch, crawl, and balance; the claimant needs to avoid concentrated exposure to fumes; mentally, the claimant is limited to simple, routine, repetitive tasks and she is capable of remembering, understanding, and carrying out fairly detailed instructions; and

5. The claimant is able to perform past relevant work.

---

[1]   In a brief submitted by plaintiff's counsel prior to the administrative hearing, plaintiff lists the following impairments:  (1) migraine headaches; (2) back pain; (3) depression; (4) asthma; and (5) allergies.  There is no mention of an ovarian cyst or fibroid tumor.  In her motion for summary judgment, plaintiff lists:  (1) migraine headaches; (2) degenerative disc disease; (3) hypertension; (4) osteoarthritis; (5) depression; and (6) asthma.   Again, there is no mention of an ovarian cyst or fibroid tumor.

1   After the Appeals Council declined review on June 8, 2007, this appeal followed.

2

3                              **II.  SUMMARY OF THE EVIDENCE**

4           The certified administrative record ("CAR") contains the following medical

5   records, listed and summarized below chronologically.[2]

6           April 7, 2000          Treatment notes by Hachi Kawakami, Pharm.D., of
                                   Sacramento Primary Care (Ex. 5F; CAR 274).
7

8           Notes indicate plaintiff was attempting to quit smoking, with a target quit date of

9   April 21, 2000, due to asthma.  No objective findings are noted.

10          May 21, 2002          Treatment notes from Sacramento Primary Care (Ex. 5F;
                                   CAR 272).
11

12          Plaintiff was still smoking but planning to quit.  Plaintiff reported with complaints

13  of coughing.  On physical examination, her chest was clear.

14          July 26, 2002         Treatment notes from Sacramento Primary Care (Ex. 5F;
                                   CAR 270).
15

16          Plaintiff was treated for abnormal vaginal bleeding.  The note indicates that

17  plaintiff had a history of depression and "was on Zoloft."  The note also indicates a history of

18  asthma.

19          July 30, 2002         Treatment notes from Sacramento Primary Care (Ex. 5F;
                                   CAR 268).
20

21          The note indicates that plaintiff's asthma is stable and that her current medications

22  will be continued.

23  / / /

24  _____

25       [2]     In particular, the CAR contains records from Sacramento Primary Care covering
    the period April 2000 through February 2005.  These records, however, are hand-written and
    largely illegible.  Where they are illegible, the court has relied on the summary provided by
26  plaintiff in her motion for summary judgment.

1        August 6, 2002        Treatment notes from Sacramento Primary Care (Ex. 5F; CAR 267).

2

3        Though the note is difficult to read, plaintiff provides the following summary:

4        Primary Care records of August 6, 2002, reflected that Ms. Huff received followup treatment for her hypertension and migraine headaches. She reported that her headaches were "behind both eyes." She indicated that increased emotion caused her headaches to be more frequent and severe. She described her headaches as feeling "like a band in front and on top of head." She reported she had been having headaches for years and currently suffered with them a few times a week. She said that her headaches could last one-to-two days and Motrin helped. The record also reflected that she started Zoloft again last week because of mood swings and increased anxiety. Her doctors stated that she should work towards improvement of her hypertension condition and migraine tension headaches. The records also noted that she suffered from photophobia and her headaches were accompanied by nausea and upset stomach. TR 267.

11        December 17, 2002        Treatment notes from Sacramento Primary Care (Ex. 5F; CAR 263).

13        Plaintiff followed up regarding hypertension and complaints of headaches. According to plaintiff's summary of this note, "[s]he reported that Zoloft was not effective and denied depression or anxiety."

16        February 20, 2003        Treatment notes from Sacramento Primary Care (Ex. 5F; CAR 262).

18        Plaintiff acknowledges that this note shows that her ". . . her headaches had improved with better control of her blood pressure."

20        June 26, 2003        Report by Paris E. Royo, M.D., of Royo Eye and Laser Center (Ex. 5F; CAR 258-59).

22        Dr. Royo reported that he originally saw plaintiff on February 14, 2003, for a complete eye examination "[h]aving given a history of an aneurysm behind her left eye with lost medical records. . . ." Other than mild myopic astygmatic refractive error with presbyopioa, which was correctable to 20/20, the eye examination was "entirely within normal limits." Plaintiff was seen on May 7, 2003, on an emergency basis "complaining of a foreign body feeling

4

in the right eye with an extremely red right eye and blurry vision in the right eye." Plaintiff reported that the condition had persisted for the six days prior to the May 2003 visit. Visual acuity in the right eye was diminished to 20/200. Dr. Royo diagnosed acute central corneal ulcer in the right eye. Medication was prescribed and by May 9, 2003, vision was improved to 20/160. By May 12, 2003, vision was further improved to 20/40. By May 28, 2003, vision was almost normal at 20/25.

> July 29, 2003          Treatment notes from Sacramento Primary Care (Ex. 5F; CAR 257).

Plaintiff was again treated for headaches and prescribed Midrin. Notes of objective findings on examination are illegible and plaintiff does not provide any summary of objective findings.

> August 20, 2003          Treatment notes from Sacramento Primary Care (Ex. 5F; CAR 255).

According to plaintiff's summary of this note, she reported that Midrin was not effective in relieving her headache pain and she was prescribed Motrin instead.

> September 20, 2003          Report of laboratory tests by Ed Larkin, M.D., of U.C. Davis Medical Center (Ex. 4F; CAR 196).

Dr. Larkin reported: "A cytospin smear is reviewed for a bloody body fluid suggestive of peripheral blood contamination." He found no abnormal cells or organisms.

> September 20, 2003          Report of x-ray of plaintiff's chest by Joseph M. Mack, M.D., of U.C. Davis Medical Center (Ex. 4F; CAR 198).

X-rays were taken to evaluate for possible pneumonia after plaintiff complained of shortness of breath. A normal cardiac silhouette was observed, along with "minimal left basilar linear atelectasis." The doctor found no evidence of focal infiltrates and the bones and soft tissues were unremarkable. The doctor concluded that there were no acute cardiopulmonary processes.

1    September 20, 2003    Report of MRA of plaintiff's neck by John Hald, M.D., of
2                          U.C. Davis Medical Center (Ex. 4F; CAR 201).

3    Dr. Hald conducted an MRA of plaintiff's neck and reported normal findings.

4    September 20, 2003    Report of MRA of plaintiff's head by John Hald, M.D., of
5                          U.C. Davis Medical Center (Ex. 4F; CAR 202).

6    Dr. Hald reported "possible right-sided ACA aneurysm" following an MRA study

7    of plaintiff's head.  He recommended a CT scan to confirm.

8    September 20, 2003    Report of CT scan of plaintiff's head by John Hald, M.D.,
9                          of U.C. Davis Medical Center (Ex. 4F; CAR 199).

10   Dr. Hald reported the following findings of a CT scan due to plaintiff's "history of

11   brain aneurysm":

12        There is no evidence of acute intracranial hemorrhage, mass, mass effect,
          or midline shift.  Ventricles, sulci, and cisternal spaces appear within
13        normal limits.  Sinuses are well aerated and there is no skull abnormality.

14   He concluded that plaintiff showed a normal head CT.

15   September 20, 2003    Report of MRI of plaintiff's brain by John Hald, M.D., of
16                         U.C. Davis Medical Center (Ex. 4F; CAR 200).

17   Dr. Hald also reported on an MRI of plaintiff's brain conducted the same day.

18   While he indicated that the study was somewhat degraded by motion, he reported that there was

19   no evidence of intracranial abnormality.

20   September 23, 2003[3]   Treatment notes from Sacramento Primary Care (Ex. 5F;
21                           CAR 254).

22   Plaintiff complained of persistent headaches.  To the extent the note reflects any

23   objective findings, it is illegible and plaintiff provides no summary of objective findings.

24   / / /

25

26   [3]        Plaintiff incorrectly states this note is from December 23, 2003.

6

| | | |
|---|---|---|
| 1 | <u>October 7, 2003</u> | Treatment notes from Sacramento Primary Care (Ex. 5F; CAR 253). |

Plaintiff was referred to a neurologist.  No objective findings recorded.

<u>October 8, 2003</u>    Initial examination report by Ashish Ghoshal, M.D. (Ex. 5F; CAR 251).

Plaintiff was seen regarding a possible aneurysm.  Dr. Ghoshal reported the following history:

> . . . The patient describes that in 1975, she had headaches, and was admitted at UC Davis and was told that she may have a AV malformation. However, it was subsequently not followed up, and records pertaining to that admission are not available.  Over the last two years currently, the patient has been experiencing headaches.  They are holocephalic, and typically occur "17 days out of a month."  They thus occur at least once every other day, and may last variably for several hours.  With the above history, the patient had been admitted at UC Davis hospital last month, and underwent a MRI of the brain which was normal.  But MR angiogram suggested a right-sided anterior cerebral artery aneurysm.  She states that conventional cerebral angiogram was deferred because of lack of authorization at the time and it was recommended that she have this performed on an outpatient basis.

Despite normal findings on physical examination, Dr. Ghoshal diagnosed possible right anterior cerebral aneurysm.   Dr. Ghoshal makes no reference to the normal CT scan performed at U.C. Davis Medical Center on September 20, 2003, following the MRA.  Dr. Ghoshal states that his diagnosis is based entirely on the MRA finding.

<u>October 21, 2003</u>    Report by Joseph Ang, M.D., of Mercy San Juan Medical Center (Ex. 1F; CAR 169-71).

Plaintiff was evaluated for possible aneurysms in the right anterior communicating artery following an MRI performed at U.C. Davis Medical Center.  No evidence of aneurysms or arteriovenous malformation was found.

/ / /

/ / /

/ / /

| | | |
|---|---|---|
| October 30, 2003 | Progress note by Ashish Ghoshal, M.D. (Ex. 5F; CAR 250). |

Dr. Ghoshal reported:

The patient returned for followup. She states that she experiences occasional headaches, and takes Tylenol on a p.r.n. basis. She was initially seen by me on 10/8/2003, and because of the suspicion of a AV malformation or aneurysm on imaging studies performed at UC Davis earlier in September, she completed a four vessel cerebral angiogram. This study was performed at Mercy San Juan hospital on 10/21/2003, and the study was normal. No obvious AV malformation or any aneurysm was detected.

Neurologic examination is normal. Blood pressure is 135/80 right arm sitting.

No additional neurologic work-up or follow-up is planned. The patient has been advised regarding the normal cerebral angiogram, and will return to her primary care physician for continuing care.

| | | |
|---|---|---|
| November 6, 2003 | Treatment notes from Sacramento Primary Care (Ex. 5F; CAR 252). |

This note is almost completely illegible. According to plaintiff's summary, the note reveals that plaintiff "reported being incapacitated due to her headaches and was trying increasing doses of Imitrex to relieve her pain." Regarding objective findings, the court can glean from the note that plaintiff was neurologically "grossly intact" and that there was no photophobia.

| | | |
|---|---|---|
| January 5, 2004[4] | Treatment notes from Sacramento Primary Care (Ex. 5F; CAR 249). |

Plaintiff was treated for asthma and a cough. No abnormal objective findings were reported and plaintiff does not reference any in her summary.

///

///

---

[4]    Plaintiff incorrectly states this note is from January 25, 2004.

1  May 14, 2004          Treatment notes from Sacramento Primary Care (Ex. 5F;
2                        CAR 243).

3          As with most of the Sacramento Primary Care notes, this note is nearly illegible.

4  Plaintiff provides the following summary:

5              Primary Care Treatment records of May 14, 2004, reflected that
6          Ms. Huff reported increased headaches.  She informed the doctors that her
           headaches were increased with air movement or vibrations.  She described
7          the headaches as being behind the left eye and in her temple, and reported
           suffering severe headaches twice a month that were accompanied by both
8          nausea and vomiting.  She also reported seeing "spots" in the periphery of
           her vision.  She said that Ibuprofin resolved her mild-to-moderate
9          headaches, but Midrin was not particularly effective for her severe
           headaches.  She was prescribed Zomig and was to continue on Midrin.  TR
10         243.

11  May 24, 2004          Report of endometrial  biopsy results by Emily L. Leff,
12                        M.D. (Ex. 5F; CAR 242).

13         Biopsy results revealed a "benign weakly proliferate endometrium showing

14  evidence of bleeding."

15  June 3, 2004          Report of pelvic sonogram by Paul M. Parsons, M.D., of
16                        Sacramento Primary Care (Ex. 5F; CAR 239).

17         Dr. Parsons reported a prior ectopic pregnancy with bilateral tube removal in 1983

18  and current pelvic pain.  His findings based on review of sonogram results were "[p]ossible early

19  anterior uterine fibroid," otherwise negative.

20  June 21, 2004          Treatment notes from Sacramento Primary Care (Ex. 5F;
21                         CAR 236).

22         Plaintiff presented with complaints of headaches.  She reported that Zomig was

23  having good results – "it kills it."

24  / / /

25  / / /

26  / / /

9

July 19, 2004          Treatment notes from Sacramento Primary Care (Ex. 5F; CAR 235).

Plaintiff received follow-up care for headaches and reported that her current medication was helping.  Her headaches were decreased in frequency from twice a week to twice a month.  Plaintiff also reported a "flare-up" of low back pain.[5]  According to plaintiff's summary:

> . . . She further related that she had a flare-up of low back pain and when she moved the pain was "white hot" in her left lower lumbar area down her buttocks to post-thigh.  The examination revealed that she had positive straight leg on the left, tenderness in the mid-thoracic through the lumbar area, and spasm and pain.  She was assessed with sciatica and was to continue her Depakote and Zomig.  Flexeril and Elavil were also added to her medication regimen.  TR 235.

July 26, 2004          Emergency room report by Garen J. Wintermute, M.D., of U.C. Davis Medical Center (Ex. 4F; CAR 185-86).

Plaintiff reported to the emergency room  with swelling over the right lateral ankle and distal leg approximately one week after sustaining a cut while shaving.  Swelling began two days before the visit and increased with associated redness and pain for the previous day.  Dr. Wintermute noted that plaintiff's past medical history was notable for asthma, COPD, migraine headaches, and hypertension.  He also noted that plaintiff had suffered an ectopic pregnancy and that she smokes.  Following a physical examination, the doctor assessed "[c]ellulitis, right leg, mild."  He ordered an x-ray to "rule out foreign body and gas" and anticipated outpatient management.

July 26, 2004          Report of x-rays of plaintiff's right ankle (Ex. 4F; CAR 187-88).

X-rays revealed "soft tissue swelling with a small effusion, no evidence of fracture."

---

[5]     This is the first mention of any musculoskeletal problem.

10

1    <u>August 23, 2004</u>         Report of x-ray of thoracic and lumbar spine by Fred
2                                  Stargarter, M.D., of Sacramento Primary Care (Ex. 5F;
                                   CAR 233).

3           Dr. Stargarter reported no definite abnormality of the thoracic spine.  As to the

4    lumbar spine, he reported:

5           There is a first-degree spondylolisthesis of L5 in relationship to S1, with
            disc space narrowing.  There is a first-degree spondylolisthesis of L4 in
6           relationship to L5.  No destructive lesion is seen.

7    He diagnosed spondylolisthesis and degenerative disc disease.

8    <u>September 20, 2003</u>[6]   Emergency room report by from U.C. Davis Medical
                                   Center (Ex. 4F; CAR 192).
9

10          Plaintiff reported to the emergency room for headache.

11   <u>September 24, 2004</u>      Treatment notes from Sacramento Primary Care (Ex. 5F;
                                   CAR 228).
12

13          Again, the note is largely illegible.  Plaintiff provides the following summary:

14          Primary Care medical records of September 24, 2004, reflected that
            Ms. Huff weighed 149 pounds.  She was treated for her low back pain, and
15          received Valporic Acid for her migraine headaches.  TR 238.[7]

16   <u>November 5, 2004</u>       Report by agency consultative physician Judy Mason, M.D.
                                   (Ex. 2F; CAR172-73).
17

18          Dr. Mason reported that plaintiff claims she can only stand "a few mins., sit 10-15

19   mins." but that there is "[n]o objective evidence to support that much limitation."  She concluded

20   plaintiff could perform "light w/ dust and fume limitation."

21   / / /

22   / / /

23   / / /

24   _____

25       [6]      Plaintiff incorrectly states this record is from September 20, 2005.

26       [7]      This note actually appears on page 228 of the CAR.

1         <u>November 8, 2004</u>     Physical residual functional capacity assessment by agency

2                                    consultative physicians[8] (Ex. 3F; CAR 174-81).

3         The agency doctors concluded that plaintiff could occasionally lift up to 20

4 pounds and frequently lift up to 10 pounds and stand/walk/sit for up to six hours in an eight-hour

5 day.  Plaintiff was assessed as unlimited in her ability to push/pull.  She should never climb

6 ladders, ropes, and scaffolds, but could otherwise occasionally climb, balance, stoop, kneel,

7 crawl, and crouch.  No manipulative, visual, or communicative limitations were found.  The

8 doctors opined that plaintiff should avoid concentrated exposure to fumes, odors, dusts, and

9 gases, but otherwise found no environmental limitations.

10         <u>November 12, 2004</u>    Treatment notes from Sacramento Primary Care (Ex. 5F;

11                                      CAR 222).

12         Though the note is illegible, plaintiff's summary states that she reported with

13 complaints of headache and back pain.  Her medications were continued.

14         <u>January 17, 2005</u>     Emergency room report by from U.C. Davis Medical

15                                    Center (Ex. 4F; CAR 183-84).

16         This two-page report notes plaintiff's vital statistics and that her chief complaint

17 was "DDD increased pain."  No objective findings, assessment, or plan are noted.

18         <u>February 15, 2005</u>    Treatment notes from Sacramento Primary Care (Ex. 5F;

19                                    CAR 208).

20         This note indicates that plaintiff was observed as "depressed/frustrated – crying."

21 / / /

22 / / /

23 / / /

24 / / /

25

26       [8]      Agency doctors Judy Mason, Patrick Bianchi, and Antoine Dipsia, are referenced.

1       <u>March 24, 2005</u>      Report by agency consultative physician Bridget Jacob,
2                          M.D. (Ex. 6F; CAR 275-76).

3       As with Dr. Mason's report, Dr. Jacob noted that, while plaintiff states that she is

4 only able to stand a few minutes at a time and sit for ten to fifteen minutes at a time, there is no

5 objective evidence to support the claim.

6       <u>May 2, 2006</u>        Report by agency examining psychologist Janie Y.
7                          Nakagawa, Ph.D. (Ex. 7F; CAR 277-79).

8       Dr. Nakagawa reported the following history:

9       Claimant is a 49-year-old, divorced, Caucasian female. Included in her
packet were medical records that described a history of left orbital
10       arteriorvenous malformation with referenced to possible aneurysms.
Complaints of bronchitis and asthma were also indicated. There were also
11       references to gynecological problems. There were self-reports that she had
difficulty standing or sitting, although there was no evidence to support
12       these assertions by Claimant. Additionally, she apparently suffered from
headaches.
13
14       In this assessment, Claimant reported that since she was 17 years old, she
suffered from migraines that occurred once a week. She took Midrin for
15       this. She also said she suffered from chronic headaches about once a
week, but the doctors did not know why these occurred. She took Ultram
16       and Midrin. She mentioned she suffered an aneurysm, but "it's gone
now." This was discovered when she was 17 years old but resolved about
17       a year or so ago. She underwent a hysterectomy in March 2005. Asked
whether that was a problem, she said, "No, it's okay now." She was
18       involved in hormone-replacement therapy. She said she suffered from
osteoarthritis that affected her hands, elbows, and back for which she took
19       Flexeril and Mobic. She suffered from hypertension and took Toprol and
hydrochlorothiazide. She was given Neurontin for pain management
20       because of her chronic headaches. Asked how many times she saw the
physician in the past year, she said it was probably two times in the last
21       year and a half.

22 Plaintiff reported that she last worked on July 2, 2001.[9] Plaintiff also told Dr. Nakagawa that the

23 longest she worked anywhere was from 1978 through 1982 for the California State Youth

24 Authority, and that she left that job because she was getting a divorce. Dr. Nakagawa reported

25 _____

26      [9]      She stated in her social security applications that she became unable to work in
July 2002.

1   that plaintiff has worked sporadically over the years.  Regarding daily activities, Dr. Nakagawa

2   reported:

3           Claimant gets up around 6 a.m.  She might make breakfast, but often her
        brother does this.  Indeed, he does all the cooking.  She might watch news
4       or TV and helps her mother.  She does some light housework, but her
        brother does much of the heavy housework.  She might eat lunch.  She
5       takes a nap for an hour or two about five times a week.  She watches TV
        after 3 p.m.  Dinner is around 4:30 p.m.  She might watch TV and is in bed
6       between 8 and 10 p.m.  She said she loved painting, drawing, and
        upholstering.

7

8   Following her evaluation, Dr. Nakagawa provided the following assessment:

9           Claimant . . . . does not evidence any notable problems with memory and
        seems able to relate appropriately in a social way.  [¶] She probably can
10      complete simple if not fairly detailed job instructions.  She seems to have
        the social skills to deal with co-workers, supervisors, and the public.  She
11      can deal with routines and changes in work routines.  However, whether or
        not the physical limitations that she describes would negatively impact on
12      her ability to work should be addressed by the appropriate physicians/
        specialists.  [¶] Claimant is considered capable of managing her funds.

13

14  Dr. Nakagawa did not diagnose any mental problems and assigned plaintiff a global assessment

15  of functioning score of 65 on a 100-point scale.

16

17                          **III.  STANDARD OF REVIEW**

18          The court reviews the Commissioner's final decision to determine whether it is:

19  (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

20  whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

21  more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

22  (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to

23  support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole,

24  including both the evidence that supports and detracts from the Commissioner's conclusion, must

25  be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

26  v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

1  decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

2  Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

3  findings, or if there is conflicting evidence supporting a particular finding, the finding of the

4  Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

5  Therefore, where the evidence is susceptible to more than one rational interpretation, one of

6  which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

7  Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

8  standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

9  Cir. 1988).

10

11                           **IV.  DISCUSSION**

12              In her motion for summary judgment, plaintiff argues:  (1) the ALJ failed to

13  develop the record regarding limitations associated with migraine headaches and back

14  impairments;[10] (2) the ALJ erred in determining that plaintiff' testimony was not fully credible;

15  and (3) the ALJ erred in relying on the vocational expert's answer to a hypothetical question

16  which did not accurately reflect plaintiff's residual functional capacity.

17       **A.    Duty to Develop the Record**

18              The ALJ has an independent duty to fully and fairly develop the record and assure

19  that the claimant's interests are considered.  See Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th

20  Cir. 2001).  When the claimant is not represented by counsel, this duty requires the ALJ to be

21  especially diligent in seeking all relevant facts.  See id.  This requires the ALJ to "scrupulously

22  and conscientiously probe into, inquire of, and explore for all the relevant facts."  Cox v.

23  Califano, 587 F.2d 988, 991 (9th Cir. 1978).  Ambiguous evidence or the ALJ's own finding that

24

25       [10]      In the table of contents to plaintiff's motion for summary judgment, she
    referenced "dermatological conditions" even though none are alleged to exist in this case and
26  there is no record of dermatology treatment.

                                   15

1    the record is inadequate triggers this duty.  See Tonapetyan, 242 F.3d at 1150.  The ALJ may

2    discharge the duty to develop the record by subpoenaing the claimant's physicians, submitting

3    questions to the claimant's physicians, continuing the hearing, or keeping the record open after

4    the hearing to allow for supplementation of the record.  See id. (citing Tidwell v. Apfel, 161 F.3d

5    599, 602 (9th Cir. 1998)).

6              Plaintiff argues that the ALJ failed to develop the record regarding the

7    "limitations associated with Ms. Huff's principal impairments – migraine headaches and

8    osteoarthritis."  Specifically, plaintiff asserts that the CAR "contained no records from Primary

9    Care, her treating source, for the entire year leading up to her hearing – the year that included her

10   hysterectomy, the County assessment finding her unemployable, the x-ray which documented the

11   osteoarthritis in her hands, as well as the ongoing treatment of her migraine headaches."  She

12   argues that the ALJ failed to request updated records.  She also contends that the ALJ failed to

13   "send Ms. Huff out for a physical or neurological consultative examination, even though the

14   majority of her testimony dealt with the limitations caused by her physical complaints –

15   specifically her migraine headaches, degenerative disk disease, and osteoarthritis."  As to this last

16   point, she adds:  "Even Dr. Nakagawa, the consultative psychological examiner, opined that

17   although Ms. Huff could probably complete 'simple if not fairly detailed job instructions,'

18   appropriate physicians/specialists should address the impact of the physical limitations that Ms.

19   Huff described."

20             Based on plaintiff's arguments, as outlined above, at issue are limitations

21   allegedly caused by the following impairments:  (1) migraine headaches; (2) osteoarthritis

22   affecting the hands; and (3) degenerative disc disease affecting the back.  The court notes that,

23   while the ALJ did not specifically discuss any problems related to plaintiff's hands, he did find

24   that osteoarthritis is a severe impairment in this case.[11]  The ALJ also concluded that migraine

25

26        [11]    This finding appears to have given plaintiff the benefit of the doubt given the lack
     of medical evidence of treatment for osteoarthritis.

headaches constitute a severe impairment.  The ALJ did not, however, discuss back problems
related to degenerative disc disease or find that this impairment is severe.  In this case, plaintiff
does not challenge the ALJ's findings regarding the severity of her impairments.  Specifically,
she does not argue that the ALJ erred by not discussing degenerative disc disease affecting the
back – which is documented in the record by Dr. Stargarter in his August 23, 2004, report of an
x-ray of plaintiff's thoracic and lumbar spine – or not listing this as a severe impairment.
Plaintiff's argument is limited to the ALJ's findings with respect to the limitations imposed by
plaintiff's impairments.

1.    Osteoarthritis Affecting the Hands

Turning first to plaintiff's contention that she is limited by osteoarthritis affecting
her hands, the court notes that there is no mention in the medical record of problems specifically
relating to the hands, and plaintiff does not refer to any such records in her summary.  The only
reference in the CAR to plaintiff's hands is in Dr. Nakagawa's May 2, 2006, evaluation in which
she reports that plaintiff complained of osteoarthritis that affected her hands, elbows, and back
for which she took Flexeril and Mobic.

Plaintiff testified at the March 2006 administrative hearing that "[t]hey just
diagnosed me with arthritis, osteoarthritis now in the hands, something to do with, they just did
an x-ray on my hands a month and a half, a few months ago now . . . and say I have
osteoarthritis."  She also testified that, even with this condition, she could pick up a series of
coins set out on the table and lift a stapler and move it from one side of the desk to another.
However, plaintiff did not provide any medical evidence supporting a diagnosis of osteoarthritis
in the hands.

As defendant notes, the notice of administrative hearing instructed plaintiff to
submit additional evidence prior to the hearing, or bring it with her.  Here, plaintiff testified that
an x-ray "a few months" prior to the hearing formed the basis of a diagnosis of osteoarthritis in
the hands.  However, she did not provide any evidence to support this testimony.  The court notes

17

that, in May 2006 – two months following the administrative hearing – plaintiff was seen by Dr. Nakagawa at which time she reported that, in the last 18 months, she had seen a doctor "probably two times."  The record reflects that plaintiff was seen at Sacramento Primary Care in February 2005 and November 2004, and at the U.C. Davis Medical Center emergency room in January 2005.  Thus, in the 18-month period preceding her statement to Dr. Nakagawa, plaintiff had three visits with medical providers, thus accounting for the "probably two times" she stated.  Plaintiff's statement that she was diagnosed with osteoarthritis in the hands "a few months" prior to the March 2006 hearing is not consistent with the foregoing and she never mentioned any such diagnosis to Dr. Nakagawa.

Plaintiff simply did not meet her burden of presenting evidence to support her contention that she is limited by osteoarthritis of the hands and it appears from plaintiff's statements as to the number of times she was seen by medical providers that there is no such evidence.  No new evidence was submitted after the administrative hearing in March 2006 in connection with plaintiff's appeal before the Appeals Council.  Moreover, in a brief submitted by plaintiff's counsel to the ALJ the day prior to the March 2006 hearing, plaintiff lists the following impairments:  (1) migraine headaches; (2) back pain; (3) depression; (4) allergies; and (5) asthma.  Despite plaintiff's testimony that she was diagnosed "a few months" prior to the March 2006 hearing, there is no mention of hand impairments in plaintiff's pre-hearing brief.  Nor, is there any mention of evidence supporting a diagnosis of osteoarthritis affecting the hands in plaintiff's motion for summary judgment.

Because plaintiff did not present any objective evidence supporting her contention that she was limited due to osteoarthritis in the hands, the ALJ was under no duty to develop the record in this regard.

/ / /

/ / /

/ / /

1          2.      Degenerative Disc Disease Affecting the Back

2          As mentioned above, the ALJ did not specifically find that plaintiff suffered from

3   a severe impairment related to her back, although he did discuss plaintiff's capacity for lifting,

4   bending, stooping, and the like.  The CAR reflects that one doctor – Dr. Stargarter – reported in

5   August 2004 that an x-ray of plaintiff's thoracic and lumbar spine revealed "first-degree

6   spondylolisthesis of L5 in relationship to S1, with disc space narrowing" and " first-degree

7   spondylolisthesis of L4 in relationship to L5."  Dr. Stargarter diagnosed spondylolisthesis and

8   degenerative disc disease.  The CAR, however, also reflects that agency consultative doctors

9   provided assessments following Dr. Stargarter's report and did not find any functional limitations

10  associated with degenerative disc disease of the back.  Thus, the evidence was not ambiguous or

11  inadequate such that the ALJ's duty to further develop the record was triggered with respect to

12  limitations associated with plaintiff's back.

13          3.      Migraine Headaches

14          The CAR reflects that plaintiff's most persistent complaint was of headaches.  As

15  with plaintiff's alleged hand problems, plaintiff claims that the ALJ failed to develop the record

16  regarding migraine headaches, particularly for the one-year period prior to the March 2006

17  hearing during which time she underwent "ongoing treatment of her migraine headaches."

18  However, the CAR contains no evidence of such ongoing treatment in the year prior to the March

19  2006 hearing.  Nor does plaintiff reference any such treatment records in her motion for summary

20  judgment.  Specifically, for the period between March 2005 and March 2006 plaintiff lists only a

21  September 2005 emergency room visit at which time plaintiff complained of headaches.  This

22  visit actually occurred in September 2003.  Other than this, plaintiff does not reference any

23  treatment records in the year preceding the March 2006 hearing.  Again, the court observes that

24  plaintiff did not reference new treatment records in her pre-hearing brief, bring such records to

25  the hearing, or submit such records to the Appeals Council.

26  ///

1          As to the record that was developed concerning plaintiff's complaints of migraine

2   headaches, the court finds that it was neither ambiguous nor inadequate.  On August 6, 2002,

3   plaintiff reported to Sacramento Primary Care that Motrin helped relieve headache pain.  On

4   February 20, 2003, she reported that her headaches had improved with better control of her blood

5   pressure.  On July 29, 2003, plaintiff was again treated for headaches and prescribed Midrin.  On

6   August 20, 2003, plaintiff reported that Midrin was not working and she was placed back on

7   Motrin, which had been effective in the past.  On October 8, 2003, plaintiff reported to Dr.

8   Ghoshal that she suffered from headaches but he noted no abnormal findings on physical

9   examination.  Notes from Sacramento Primary Care dated November 6, 2003, indicate that

10  plaintiff was neurologically "grossly intact" and that there was no photophobia.  On May 14,

11  2004, plaintiff reported that Ibuprofin helped with her headaches and Zomig was added to her

12  regimen of headache medications.   By June 21, 2004, plaintiff reported to Sacramento Primary

13  Care that Zomig was having good results – "it kills it."  On July 19, 2004, plaintiff reported that

14  her headaches were decreased in frequency from twice a week to twice a month.  On September

15  24, 2004, plaintiff received Valporic Acid for her migraine headaches.  Plaintiff reported to

16  Sacramento Primary Care on November 12, 2004, and her medications were continued.  In May

17  2006 plaintiff reported to Dr. Nakagawa that she was given Neurontin for pain management

18  because of her chronic headaches.

19          While plaintiff reported to the U.C. Davis emergency room in September 2003

20  with complaints of headaches, no objective findings were noted.  Similarly, each time plaintiff

21  presented to Sacramento Primary Care for headaches, no significant objective findings were

22  noted.  It is clear that plaintiff never sought treatment beyond medications, which provided relief.

23  Other than reporting to Dr. Ghoshal, who noted no abnormal findings on physical examination,

24  plaintiff never sought further consultations regarding migraine headaches.

25  / / /

26  / / /

20

1          Further, to the extent plaintiff contends that she became unable to work in July

2   2002 due to the debilitating effects of headaches, her employment history suggests otherwise.  As

3   reported by Dr. Ghoshal, plaintiff suffered from headaches since 1975.  She also reported to Dr.

4   Nakagawa that she worked for the California State Youth Authority from 1978 through 1982.

5   Thus, despite headaches, she was able to sustain gainful work activity.  Plaintiff also reported to

6   Dr. Nakagawa that she left this job due to her divorce and not due to headaches.  Moreover,

7   despite plaintiff's contention of headaches since 1975, she was able to work through the alleged

8   onset date in July 2002.  There is no indication on the CAR of any event occurring around 2002

9   which exacerbated her headaches such that their severity changed and became debilitating as of

10  July 2002.  While plaintiff was tested for a possible aneurysm in 2003, no abnormality was found

11  and plaintiff told Dr. Nakagawa that she does not have an aneurysm.

12          For these reasons, the court finds that the ALJ was under no duty to further

13  develop the record with respect to limitations caused by plaintiff's migraine headaches.

14      **B.      Plaintiff's Credibility**

15          The Commissioner determines whether a disability applicant is credible, and the

16  court defers to the Commissioner's discretion if the Commissioner used the proper process and

17  provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

18  credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

19  F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

20  821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

21  and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

22  evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

23  credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d

24  1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007),

25  and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

26  / / /

1          If there is objective medical evidence of an underlying impairment, the

2   Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

3   because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

4   341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

5               The claimant need not produce objective medical evidence of the
             [symptom] itself, or the severity thereof.  Nor must the claimant produce
6            objective medical evidence of the causal relationship between the
             medically determinable impairment and the symptom.  By requiring that
7            the medical impairment "could reasonably be expected to produce" pain or
             another symptom, the Cotton test requires only that the causal relationship
8            be a reasonable inference, not a medically proven phenomenon.

9            80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in
             Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).
10

11   The Commissioner may, however, consider the nature of the symptoms alleged, including

12   aggravating factors, medication, treatment, and functional restrictions.  See Bunnell, 947 F.2d at

13   345-47.  In weighing credibility, the Commissioner may also consider: (1) the claimant's

14   reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2)

15   unexplained or inadequately explained failure to seek treatment or to follow a prescribed course

16   of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-

17   party testimony about the nature, severity, and effect of symptoms.  See Smolen, 80 F.3d at 1284

18   (citations omitted).  It is also appropriate to consider whether the claimant cooperated during

19   physical examinations or provided conflicting statements concerning drug and/or alcohol use.

20   See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the claimant testifies as to

21   symptoms greater than would normally be produced by a given impairment, the ALJ may

22   disbelieve that testimony provided specific findings are made.  See Carmickle, 533 F.3d at 1161

23   (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

24   ///

25   ///

26   ///

1        As to plaintiff's credibility, the ALJ began by outlining his finding as to plaintiff's

2   residual functional capacity and added:

3        This finding is supported by the claimant's testimony that she does light
         housekeeping, washes dishes, makes beds, shops with her mother, drives,
4        watches television, and does drawing and painting for her hobbies.  The
         claimant contended that she is capable of carrying out only simple
5        repetitive tasks; the absence of supporting facts and the opinion of the
         consultative examiner [Dr. Nakagawa] do not support such a finding.

6                    * * *

7
         In reaching this decision [as to plaintiff's residual functional capacity], the
8        undersigned has also considered the allegations of the claimant's pain,
         symptoms, and limitations as required by Ninth Circuit case law, 20 CFR
9        404.1529(c), 416.929(c), and Social Security Ruling 96-7p.  The claimant
         testified that she has not sought employment due to health issues.
10
         However, the Administrative Law Judge finds that the statements
11       concerning the intensity, duration, and limiting effects of those symptoms
         are not entirely credible for the following clear and convincing reasons.
12       First, the analysis of the claimant's non-severe impairment, supra, is
         incorporated by reference herein.  Second, the claimant's treatment has
13       been routine or conservative in nature.  Third, the record reflects some
         gaps in treatment, further indicating that the claimant's symptoms and
14       limitations have not been as serious as has been alleged in connection with
         this application and appeal.  Fourth, in a post-hearing psychological
15       consultative evaluation dated May 2, 2006, Dr. Nakagawa gave no
         diagnosis and reported the claimant's Global Assessment of Functioning
16       (GAF) at 65, suggesting mild symptoms, but generally acceptable
         function.  Fifth, the claimant is not taking medications of a type and
17       dosage consistent with her allegations.  Sixth, the record does not indicate
         that the claimant suffers from debilitating side effects from her
18       medications.  Seventh, no treating or examining physician has opined that
         the claimant is totally and permanently disabled from all work.  Eighth, the
19       claimant was able to participate in the administrative hearing and respond
         to the questioning without any apparent difficulties.  Ninth, concerning her
20       activities of daily living, the claimant has described daily activities which
         are not limited to the extent one would expect, given the complaints of
21       disabling symptoms and limitations.  Tenth, even though the claimant has
         asthma, she testified that she still smokes cigarettes.
22
         After considering the evidence of record, the undersigned finds that the
23       claimant's medically determinable impairments could reasonably be
         expected to produce the alleged symptoms, but that the claimant's
24       statements concerning the intensity, persistence, and limiting effects of
         these symptoms are not entirely credible.
25
26   The court finds that the reasons provided by the ALJ are clear and convincing.

                                    23

1          The question is whether the ALJ's credibility finding is supported by substantial

2    evidence.  Some of plaintiff's argument are addressed in turn below.[12]

3          1.     Treatment was consistent with plaintiff's statements of debilitating
                   symptoms and limitations.

4

5          Plaintiff contends that "routine and conservative" treatment is consistent with

6    "most chronic medical conditions, like [herself]."  She also notes in her hearing testimony that:

7          Besides cold compresses, dark, very dark rooms because the lights and
           everything will bother me, movement, all of those things will bother me,

8          so I try to curl up and lay down in a dark room, very quiet, cold
           compresses and that's the extent of it.

9

10   As to dark rooms, which apparently refers to photophobia related to migraine headaches, the

11   CAR reflects that, while she complained of photophobia in August 2002, by November 2003

12   treatment notes from Sacramento Primary Care indicate that plaintiff was neurologically "grossly

13   intact" and that there was no photophobia.  Thus, the evidence does not support plaintiff's

14   contention that she required seclusion in dark rooms due to her migraine headaches which, as

15   discussed above, were apparently well-controlled with medication.  Further, while the court

16   agrees that plaintiff's admittedly conservative course of treatment is consistent with her

17   impairments, it is not consistent with the severity of symptoms and limitations to which she

18   testified.  For example, there is no indication of consultation with specialists for her any of her

19   problems other than the possible aneurysm.  Rather, plaintiff consistently sought only general

20   care from Sacramento Primary Care and the U.C. Davis emergency room.

21   / / /

22   / / /

23   / / /

24

25        [12]     Even if the court were to agree with plaintiff as to those arguments not discussed
     in this order, the ALJ's credibility findings must be affirmed so long as even one of the reasons
26   provided by the ALJ is supported by substantial evidence.

2.      Although plaintiff denied any mental health problems when examined by Dr. Nakagawa, she was nonetheless assigned a GAF score of 65, indicating mild symptoms.

This argument is totally puzzling.  First, plaintiff admits that she does not suffer from mental problems (i.e., depression) and thus admits to no limitations associated with depression.  Second, plaintiff states that a GAF score of 65 indicates "mild limitations."  Given that "mild limitations" are far from the severely disabling symptoms and limitations to which plaintiff testified, she again seems to concede the point.

3.      As to side effects, plaintiff reported a 20-pound weight gain due to medications and some of her medications list drowsiness and/or dizziness as possible side effects which she in fact experienced.

Regarding plaintiff's contention that, contrary to the ALJ's statement that she experienced no adverse side effects of medications, she experienced a 20-pound weight gain, plaintiff does not contend that she is limited by her weight or that she is obese.  Turning to drowsiness and dizziness, while plaintiff testified to having experienced these adverse side effects, there is no objective medical evidence to support this testimony or that drowsiness and/or dizziness impacted her ability to perform work activities.

4.      The absence of a treating or examining physician's opinion regarding plaintiff's limitations was within the ALJ's power to remedy.

This is a re-casting of plaintiff's argument, discussed above, that the ALJ failed to develop the record regarding plaintiff's alleged limitations.  The court finds that the ALJ did not err in this regard.  It was plaintiff's responsibility to produce evidence of disabling impairments.

5.      Plaintiff's ability to sit through a 45-minute administrative hearing did not tarnish her credibility.

The court disagrees.  As reported by the agency consultative doctors, plaintiff has stated that she is only able to stand a few minutes at a time and sit for ten to fifteen minutes at a time.  Plaintiff's ability to "sit through" a 45-minute hearing is inconsistent with these prior statements and does in fact undermine her credibility.

C.    **Hypothetical Questions**

Hypothetical questions posed to a vocational expert must set out all the substantial, supported limitations and restrictions of the particular claimant.  See Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's limitations, the expert's testimony as to jobs in the national economy the claimant can perform has no evidentiary value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While the ALJ may pose to the expert a range of hypothetical questions, based on alternate interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's determination must be supported by substantial evidence in the record as a whole.  See Embrey v. Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

Plaintiff argues that the ALJ erred by relying on the vocational expert's answer to a hypothetical question which did not account for her testimony that:  (1) she required daily naps and seclusion in a dark room; (2) was limited in the use of her hands; and (3) she would miss work due to the frequency and impact of migraine headaches.  For the reasons discussed above, the court concludes that the ALJ did not err by discounting each of these alleged limitations.  Therefore, the hypothetical question accurately reflected plaintiff's residual functional capacity.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

    1.      Plaintiff's motion for summary judgment (Doc. 19) is denied;

    2.      Defendant's cross-motion for summary judgment (Doc. 28) is granted; and

    3.      The Clerk of the Court is directed to enter judgment and close this file.

DATED:  December 9, 2008

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE

27